**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 11-61812-CIV-ALTONAGA/Simonton**

**MARIO DIAZ**, *et al.*,

      Plaintiffs,

vs.

**AMERIJET INTERNATIONAL, INC.,**

      Defendant.

_____/

## ORDER

**THIS CAUSE** came before the Court upon Defendant, Amerijet International, Inc.'s ("Amerijet['s]") Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(h), Or, In the Alternative, Fully-Dispositive Motion for Summary Judgment ("Motion") [ECF No. 101], filed March 19, 2012.  Plaintiffs filed a Complaint [ECF No. 1] on August 12, 2011, alleging one count for violations of Sections 2, Third and Fourth of 45 U.S.C. §§ 151, *et seq.* ("Railway Labor Act" or "RLA"), or "infringement on Plaintiffs' rights to engage in and to organize union activities and representation."  (Compl. 2).  The Court has previously denied Amerijet's motions to dismiss the Complaint on the basis of Federal Rule of Civil Procedure ("Federal Rule") 12(b)(6) (*see* Nov. 9, 2011 Order [ECF No. 32]) and Federal Rule 12(b)(1) (*see* Nov. 28, 2011 Order [ECF No. 37]).  Amerijet now moves to dismiss the Complaint under Federal Rule 12(h), or, in the alternative, for summary judgment on Plaintiffs' claims.  Plaintiffs filed a Response [ECF No. 119] on April 2, 2012.  Amerijet filed its Reply [ECF No. 127] on April 12, 2012.  The Court has carefully considered the parties' submissions and the applicable law.

# I.  LEGAL STANDARDS

### A.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendant Amerijet moves to dismiss the Complaint under Federal Rule 12(h)(3), which provides that "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  FED. R. CIV. P. 12(h)(3).  A defendant may attack subject matter jurisdiction in two ways — a facial attack or a factual attack.  Amerijet asserts the portion of the Motion concerning subject-matter jurisdiction is a factual attack, "not duplicative of the grounds" addressed in the Court's November 28, 2011 Order, and "based upon the facts as now known after discovery."  (Mot. 13 n.13).  For the purpose of Federal Rule 12(h), Amerijet seeks to use the undisputed facts that also serve as the basis for the portion of the Motion seeking summary judgment.  (*See id.*).  A factual attack "challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings such as testimony and affidavits, are considered."  *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).  In a factual attack, courts are free to weigh the evidence to satisfy themselves they have the power to hear the case.  *See Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990).  No presumption of truth attaches to the plaintiff's allegations, and the existence of disputed material facts does not prevent the trial court from evaluating for itself the merits of the jurisdictional claim.  *See id.*  Moreover, "[i]n the face of a factual challenge to subject matter jurisdiction, the burden is on the plaintiff to prove that jurisdiction exists."  *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) (citations omitted).

### B.    Motion for Summary Judgment

Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  In making its assessment of summary judgment, the Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc*., 117 F.3d 1278, 1285 (11th Cir. 1997), and "must resolve all reasonable doubts about the facts in favor of the non-movant." *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of America*, 894 F.2d 1555, 1558 (11th Cir. 1990).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.  Likewise, a dispute about a material fact is a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.  In those cases, there is no genuine issue

of material fact "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

## II. BACKGROUND[1]

Amerijet is a small cargo airline serving the Caribbean and Latin America, with its domestic flights originating from and terminating at Miami International Airport ("MIA"). (*See* Amerijet's Concise Statement of Undisputed Material Facts . . . ("SMF") [ECF No. 102] ¶ 1). In addition to aircraft flight operations, Amerijet's operations at MIA include the "provision of warehousing, warehouse services, and/or transportation of cargo and loading/unloading of cargo at the airport," collectively referred to as "cargo handling services" pursuant to the Airline Use Agreement and related policies and leases in place between Miami-Dade County ("County"), which owns and manages MIA, and the airlines such as Amerijet that use MIA. (*Id.* ¶¶ 2–3). Amerijet has cargo handling employees at locations other than MIA in Miami and at locations throughout the country. (*See id.* ¶ 4). As a small airline, Amerijet's pay rates have not matched the rates of large air carriers in the industry. (*See id.* ¶ 5). Amerijet employees performing cargo handling services ("Cargo Handlers") were at the low end of Amerijet's wage scale, due to the skill and experience required for that position. (*See id.* ¶ 6).

Beginning in February 2010, in addition to handling its own cargo, Amerijet began providing cargo handling services to another air carrier, British Airways ("BA"), at MIA. (*See id.* ¶ 7). Cargo handling services performed by one airline lessee for another airline at MIA are permitted under the Airline Use Agreement and under Amerijet's lease with MIA, with approval from the Miami-Dade County Aviation Department ("MDAD"). (*See id.* ¶ 8). Amerijet obtained approval from the MDAD to handle BA's cargo. (*See id.* ¶ 9).

---

[1]  Unless otherwise noted, the facts are undisputed.

When Amerijet began handling BA's cargo, the Miami-Dade County Code contained a Living Wage Ordinance ("Wage Ordinance").  (*See id.* ¶ 10).  Since 2002, the Wage Ordinance has required any service contractor providing "covered services" at MIA to pay an employee performing a covered service a minimum hourly wage set by the County and higher than the state and federal minimum wage.  (*Id.* ¶ 11).  Since 2006, the Wage Ordinance has included "in-warehouse cargo handling" among covered services.  (*Id.* ¶ 12).  The Wage Ordinance requires covered employers to post "Living Wage Notices" in work areas throughout MIA stating the current minimum wage for covered employees and the process for making a complaint to the County of a violation of the Wage Ordinance.  (*Id.* ¶ 13).

In June 2010, Amerijet's Senior Director of Airport Operations, Rasheme Richardson ("Richardson"), received a letter from the Miami-Dade County Department of Small Business Development ("SBD"), which enforces the Wage Ordinance.  (*See id.* ¶ 14).  The letter ("SBD Letter") notified Amerijet that the SBD was initiating an investigation into Amerijet's compliance with the Wage Ordinance, specifically as to Amerijet's employees performing cargo handling services for BA ("Cargo Handlers for BA").  (*See id.* ¶¶ 14–15).  The SBD Letter stated that the County "has received a complaint from an Amerijet employee who indicated that Amerijet had started providing cargo services for British Airways and other airlines and [employees] are not being paid a living wage."  (*Id.* ¶ 15).  The SBD Letter further stated that Amerijet's failure to pay the Cargo Handlers for BA the minimum wage pursuant to the Wage Ordinance would violate that Ordinance.  (*See id.*).  The SBD requested certain information from Amerijet as part of its investigation.  (*See id.* ¶ 16).

Amerijet engaged outside counsel for assistance regarding the SBD Letter.  (*See id.* ¶ 17). During discussions between Amerijet's outside counsel and the County Attorney's Office, the

SBD informed Amerijet in July 2010 that in response to Amerijet's request, no response to the County's information requests would be required until the County made a legal determination with respect to Amerijet's compliance with the Wage Ordinance as concerned the Cargo Handlers for BA.  (*See id.* ¶ 18).   The County Attorney's Office never issued a legal determination.  (*See id.* ¶ 19).   Amerijet never pressed the County Attorney's Office for an opinion, and the SBD took no further steps to investigate.  (*See id.* ¶ 20).

Michael Simpson ("Simpson"), business agent at the International Brotherhood of Electrical Workers ("IBEW") (*see id.* ¶ 29), met with several Plaintiffs, including Plaintiff Jonathan Guerrero ("Guerrero"), several times between March 21 and April 29, 2011, about potentially joining the IBEW union.  (*See* Pls.' Additional Facts ("SAF") [ECF No. 119-1] ¶ 1). Plaintiffs, all Cargo Handlers, believe they should have been paid in accordance with the Wage Ordinance.  (*See* SMF ¶ 57).

On April 8, 2011, the IBEW, Local 349, filed a petition ("IBEW Petition") seeking to represent Amerijet's 34 in-warehouse Cargo Handlers at MIA under Section 9 of the National Labor Relations Act ("NLRA").  (*See id.* ¶ 21).  The IBEW Petition identified cargo handlers as the unit of which a substantial number of employees wished to be represented by the IBEW for collective bargaining.  (*See* SAF ¶ 5).  Richardson received a facsimile dated April 8, 2011 from the National Labor Relations Board ("NLRB") enclosing the IBEW Petition.  (*See* SMF ¶ 22; Resp. to Amerijet's Statement of Undisputed Material Facts ("SMFO") [ECF No. 119-1] ¶ 22). Richardson forwarded the facsimile to Amerijet's in-house counsel.  (*See* SMF ¶ 23).  In the faxed letter, the NLRB advised that it intended to conduct a formal investigative hearing on April 18, 2011 if one was necessary.  (*See* SAF ¶ 6).

Since 2004, some of Amerijet's employees, specifically its pilots and flight engineers,

have been represented by the International Brotherhood of Teamsters ("IBT"), Local 769.  (*See* SMF ¶ 24).   Based on its experience with the IBT, Amerijet knew that the NLRB lacked jurisdiction over Amerijet, an air carrier covered exclusively by the Railway Labor Act ("RLA") and the National Mediation Board ("NMB"), which administers the RLA.  (*See id.* ¶¶ 25, 40). The IBT received an intervenor letter from the NLRB with a copy of the IBEW Petition.  (*See id.* ¶ 26).  Upon receipt, IBT President Michael Scott ("Scott") advised the NLRB supervising agent in charge of the matter, Karen Thornton ("Thornton"), that Amerijet was an airline and covered by the RLA.  (*See id.* ¶ 27).   Thornton agreed with Scott.  (*See id.* ¶ 28).   As a matter of professional courtesy, Scott telephoned Simpson and informed him the NLRB lacked jurisdiction over Amerijet.  (*See id.* ¶ 29).  Scott told Simpson that organizing under the NMB must be done on a system-wide basis and not based on a single location.  (*See id.* ¶ 35).

Amerijet holds a U.S. Department of Transportation air carrier operating certificate as well as several certificates of public convenience and necessity.  (*See id.* ¶ 39).  The NMB in two certification decisions has made formal findings that Amerijet is a carrier within the meaning of the RLA, and the NMB has jurisdiction over disputes between Amerijet and its employees.  (*See id.* ¶ 40).  Amerijet sets forth the flight schedule and information on its public website for its services in air transportation of cargo in foreign commerce.  (*See id.* ¶ 41).  After receiving the IBEW Petition, on April 12 and 13, 2011, Amerijet's general counsel filed a position statement and supplemental position statement addressing the NLRB's lack of jurisdiction.  (*See id.* ¶ 42).

After doing some research on the matter, the IBEW recognized it could not simply re-file the IBEW Petition with the NMB, whose requirements differ from NLRB requirements.  (*See id.* ¶ 36).  The IBEW further saw it did not have the requisite number of authorization cards under the RLA.  (*See id.*).  Under the RLA, a petition for representation must be supported by signed

authorization cards from 35% of the employees in a system-wide craft or class.  (*See id.* ¶ 30).

Under the NLRA, a petition for representation must be supported by a showing that 30% or more

of the employees in the bargaining unit seek union representation.  (*See id.* ¶ 31).  On April 14,

2011, Simpson orally requested that the NLRB withdraw the IBEW Petition, which request was

approved the same day by the NLRB Regional Director of Region 12, Rochelle Kentov.  (*See id.*

¶ 48).  Simpson believed the NMB had jurisdiction, which he verified after receiving a final

determination on the matter from the NMB.  (*See id.* ¶ 37; SMFO ¶ 37).

Amerijet was promptly notified by the NLRB that the IBEW Petition was withdrawn, and

the NLRB was terminating proceedings with respect to Amerijet.  (*See* SMF ¶ 49).  Until

Plaintiffs filed the instant suit, Amerijet had no knowledge of which, if any, of the 34 Cargo

Handlers had signed a card with the IBEW or any other union to represent them.  (*See id.* ¶ 44).

No employees informed Amerijet that they signed a union authorization card.  (*See id.* ¶ 46).

Amerijet claims it hired employee relations consultant Alex Casillas ("Casillas") to meet

with the 34 Cargo Handlers, outside the presence of Amerijet supervision or management, to find

out why employees were taking grievances to the County instead of directly to Amerijet, and to

determine where Amerijet could make improvements.  (*See id.* ¶ 51).  Amerijet claims that

Casillas met with Vice President of Human Resources Isis Suriá ("Suriá") who briefed him on

the Wage Ordinance and NLRB filing.  (*See id.* ¶ 52).  Amerijet claims it met Casillas only once,

prior to his meeting Amerijet employees, and they discussed County ordinance issues and

Amerijet's position.  (*See* SAF ¶ 7).  According to Amerijet, it did not discuss union activities

with Casillas.  (*See id.*).  On April 19 and 20, 2011, Casillas met with the employees at issue in

small groups.  (*See* SMF ¶ 53).  Nobody apart from Casillas and the Cargo Handlers was present

at these meetings.  (*See id.* ¶ 54).  Simpson has stated that he heard nothing from Plaintiffs

regarding their conversations with Casillas that he thought would be grounds for an unfair labor practice.  (*See id.* ¶ 55).

On April 29, 2011, Amerijet entered into a service contract with Alliance Ground International, Inc. ("AGI"), a third party cargo handling services contractor at MIA, to perform the services for the BA contract.  (*See id.* ¶¶ 66–67).  The fee for the outsourced service was based on a price per kilogram of cargo moved, and it was AGI's responsibility to budget labor costs.  (*See id.*).  Also on April 29, 2011, as a result of the contract with AGI, Amerijet laid off all of its in-warehouse Cargo Handlers at MIA.  (*See id.* ¶ 67).

Simpson had continued to meet with a mixed group of Cargo Handlers, on multiple occasions, after the submission of the IBEW Petition to the NLRB and prior to their discharge.  (*See* SAF ¶ 2).  All twenty-two (22) Plaintiffs signed union authorization cards prior to their termination by Amerijet.  (*See id.* ¶ 3).  Following Plaintiffs' termination, Simpson filed an unfair labor practice charge with the NLRB based on Amerijet firing Plaintiffs for their attempt to organize.  (*See id.* ¶¶ 4–5).  According to Simpson, the IBEW never filed a petition with the NMB because it required a petitioner to have 35% of all cargo handlers of the company, and while he was in the process of obtaining the requisite signatures, the Cargo Handlers were fired.  (*See* SMF ¶ 38; SMFO ¶ 38).

On August 29, 2010, Plaintiff Rafael Bello ("Bello") sustained a claimed occupational injury.  (*See* SMF ¶ 72).  Bello was out of work simultaneously on workers' compensation leave and Family and Medical Leave Act ("FMLA") leave after he requested and received the same.  (*See id.* ¶ 73).  Bello's personnel file reflects he was terminated in early April 2011 because his "FMLA expired/WC" and "FMLA expired, unable to return to work at present time."  (*Id.* ¶ 75).  By letter dated April 7, 2011, Amerijet notified Bello by certified mail that his employment at

Amerijet was terminated, effective April 8, 2011.  (*See id.* ¶ 76).  Bello signed the certified mail

return receipt, acknowledging receipt of this letter, on April 14, 2011.  (*See id.* ¶ 77).  At no point

from August 20, 2010 until his termination did Bello return to work at Amerijet.  (*See id.* ¶ 78).

### III.  ANALYSIS

Amerijet seeks dismissal of the Complaint pursuant to Federal Rule 12(h), or, in the

alternative, summary judgment on Plaintiffs' claims.  The Court addresses Amerijet's arguments

in turn.

### A.     Motion to Dismiss for Lack of Subject Matter Jurisdiction

As noted, the Court has denied Amerijet's previous motion to dismiss the Complaint for

lack of subject matter jurisdiction.  (*See* Nov. 28, 2011 Order).  In that motion, Amerijet

contended that Plaintiffs did not have a private right of action under RLA Section 2, Third or

Fourth.  (*See id.* 7).  The Court observed that "the great weight of law persuades the Court that

private rights of action exist under the RLA for major disputes," after having explained that the

present action is just such a major dispute.  (*Id.*).  The Court further declined to find Plaintiffs

were barred on grounds of judicial estoppel from bringing their RLA claim where they had

previously filed a charge under the NLRA, as Plaintiffs had not "succeeded" in their prior NLRA

claim.  (*Id.* 10–11).

In the present motion, Amerijet again contends Plaintiffs have no private right of action

under the RLA, Section 2, Third or Fourth.  (*See* Mot. 14).  This time, however, Amerijet has

reframed its argument somewhat.   Amerijet asserts, "Plaintiffs' efforts to obtain a labor

representative under the NLRA pursuant to the NLRB's processes, and with respect to a unit of

employees clearly not eligible for labor representation under the RLA, cannot give rise to a

private right of action to enforce Section 2, Third or Fourth of the RLA."  (*Id.*).  According to

Amerijet, "there can be no violation of the RLA as a result of organizing activities which undisputedly and unequivocally were engaged pursuant to the NLRA and which concern a proposed bargaining unit cognizable only under the NLRA." (*Id.*).   Amerijet bases this contention on the black letter principle that the NLRA and RLA are "independent and mutually exclusive federal labor schemes."  (Nov. 28, 2011 Order (quoting *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377 (1969))).  Amerijet further argues that the fact that the RLA Section 2, Third and Fourth repeats the phrase "for the purposes of this [Act]" is proof that activities governed by the RLA must have been engaged in specifically with the RLA in mind.  (Mot. 15–16).

Amerijet contends its argument now differs from the one that previously failed because it incorporates facts obtained through discovery.  (*See id.* 13 n.13).  Nevertheless, the only fact the Court can identify relevant to this argument is that Plaintiffs' initial organizing efforts were done "pursuant to the NLRB's processes," as opposed to those of the RLA.  (*Id.* 14).  Amerijet contends:

> Where the petition for representation was filed with the NLRB and not the NMB, where the unit sought in the petition is one potentially appropriate under the NLRA only and not the RLA, and where the authorization cards obtained from certain Plaintiffs were provided to the NLRB and not the NMB, Plaintiffs' efforts to obtain union representation can only be deemed to have occurred under the NLRA.

(Mot. 16).

These, however, are not new facts.  The Court is somewhat astonished that Amerijet could call them new, given that Plaintiffs advised they had initially pursued a charge with the NLRB on the first page of their Complaint (*see* Compl. 1 n.1), and the previous NLRB action was extensively discussed in the November 28, 2011 Order.  The Court and all parties have been aware from the inception of this lawsuit that Plaintiffs previously proceeded under (*i.e.*, acted to

conform to the procedures of) the NLRA.  Notwithstanding this undisputed fact, the Court found that the organization activities alleged by Plaintiffs stated a claim under the RLA.  (*See* Nov. 9, 2011 Order).  The November 9, 2011 Order's holding necessitates the conclusion that Plaintiffs' original focus on following NLRB procedures does not negate Plaintiffs' ability to state a RLA claim.

Amerijet's argument therefore could be construed as partly asking the Court to reconsider its denial of Amerijet's earlier attempt to dismiss the Complaint under Federal Rule 12(b)(6).  In order to succeed, Amerijet would need to raise grounds that would merit reconsideration, such as actually *new* evidence or potential clear error or manifest injustice.  *See Instituto de Prevision Militar v. Lehman Bros., Inc.*, 485 F. Supp. 2d 1340, 1342 (S.D. Fla. 2007).  As discussed, the simple fact of the original NLRA petition is not new evidence.  Furthermore, the Court does not find it points to a clear error or manifest injustice.  Apparently, Amerijet contends that because the RLA and NLRA are two distinctive statutory schemes, there can be *no* overlap *as a matter of law* between the types of activities governed by either statute.  Such a position has no basis in the language of either statute or even in common sense.  Both statutes deal with employees' right to self-organize.  The NLRA provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, . . . ."  29 U.S.C. § 157.  The RLA provides that "[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing."  45 U.S.C. § 152, Fourth.  Amerijet's narrow focus on the procedure applicable to Amerijet entirely misses the point — both of these statutes protect the right to organize.  Plaintiffs allege they took steps to organize themselves.  Just because the causes of action under the RLA and NLRA are mutually exclusive does not mean the activities they govern necessarily are, as a matter of law.

The Court has already ruled that Plaintiffs would have been allowed to temporarily pursue inconsistent claims based on the same set of facts, if it were unclear which statute governed their activities.  (*See* Nov. 28, 2011 Order 11).  The Court ruled thus because the types of activities governed by the two statutes are inherently similar.  The undisputed fact that the IBEW initially filed a NLRA Petition, then voluntarily withdrew it with the intent of proceeding before the NMB (*see* SMF ¶¶ 36–38; SMFO ¶ 38), does not therefore mean that *all* of the prior alleged organizational activity would be irrelevant as a matter of law under the RLA.  The Court declines to grant the Motion on this basis.  The Court does not find that Plaintiffs' previous actions under the NLRA deprive the Court of its subject matter jurisdiction under the RLA as a matter of law.

### B.    Motion for Summary Judgment

The Court stated in the November 9, 2011 Order that the burden-shifting test as set forth in *Wright Line, A Division of Wright Line, Inc.*, 251 N.L.R.B. 1083, 1083–88 (1980), applies to RLA claims.  (*See* Nov. 9, 2011 Order 5).  In order to make a *prima facie* case under the *Wright Line* framework, an employee must show:

> (1) the employee engaged in union or other protected activities; (2) the employer knew of the employee's involvement in protected activities; (3) the employer harbored animus towards those activities; and (4) there was a causal connection between the employer's animus and its discharge decision.

*Carry Cos. of Ill., Inc. v. NLRB*, 30 F.3d 922, 927 (7th Cir. 1994) (citation omitted).  If the employee succeeds in proving a *prima facie* case, "the burden shifts to the employer to demonstrate by a preponderance of evidence that it based its discharge decision on unprotected conduct and that it would have fired the employee anyway."  *Id.* (citations omitted).

Amerijet contends that Plaintiffs do not establish a *prima facie* case, and even if they do, Amerijet has proven it would have taken the same action in terminating Plaintiffs' employment

"even in the absence of any anti-union animus." (Mot. 19).  The Court addresses each argument in support of this position in turn.

### 1.   *Whether Plaintiffs Engaged in RLA-Protected Activities*

Amerijet does acknowledge that activities "which arguably could" merit RLA protection are "meeting with the IBEW pre-layoff (apparently engaged in by four of the Plaintiffs), solicitation of union authorization card signatures (apparently engaged in by two or three of the Plaintiffs), and signing a union authorization card (apparently engaged in by each of the remaining Plaintiffs)." (*Id.*).  The Court agrees.

However, Amerijet then reiterates the unpersuasive argument that these activities were done in view of the NLRA and are necessarily unprotected by the RLA.  (*See id.* 20).  Apart from this invalid contention, Amerijet offers no reason why the above-cited, undisputed facts would be irrelevant to organization activities protected by Section 2, Third and Fourth of the RLA.  As this argument effectively mirrors Amerijet's unsuccessful motion to dismiss under Federal Rule 12(h), the Court does not grant the Motion on this basis.

### 2.   *Whether Amerijet Knew of Plaintiffs' Involvement in Protected Activities*

Amerijet next contends that even if Plaintiffs engaged in protected activities, "Amerijet did not know of any Plaintiff's involvement in any of those activities prior to the layoff of the Plaintiffs and Amerijet's other in-warehouse cargo handlers at MIA." (*Id.* 21).  The Court finds, however, it is a relatively straightforward matter to find at least a disputed issue of material fact as to whether Amerijet knew of Plaintiffs' organization activities.  What is absolutely undisputed, and has been rehashed in this litigation *ad nauseam*, is that the IBEW Petition was initially filed with the NLRB on Plaintiffs' behalf.  It is undisputed that Amerijet learned about this Petition no more than a few days after it was filed, in a letter from the NLRB to Amerijet

dated the same day as the IBEW Petition.  (*See* SMF ¶¶ 22–23).  In fact, a few days after the IBEW Petition was filed, Amerijet's general counsel filed two position statements in response. (*See id.* ¶ 42).

A fact-finder could infer from these undisputed facts that if Amerijet knew of the IBEW Petition, it knew of some of the organizing activity that led to the filing of that Petition, which activity was relevant to the RLA.  While it is also undisputed that Amerijet did not know before the Complaint was filed exactly which Plaintiffs had signed union cards (*see id.* ¶ 44), there is more than sufficient evidence to create at least a disputed issue of material fact as to whether Amerijet knew that Plaintiffs were organizing themselves, as relevant to the RLA, prior to their termination.

### 3.    *Whether Amerijet Harbored Animus Toward Plaintiffs' Activities*

Amerijet states that to the extent Plaintiffs seek to introduce the statements of Casillas to Plaintiffs as evidence of this element, "Amerijet is prepared to stipulate for purposes of summary judgment <u>only</u> that Mr. Casillas' remarks manifest a generalized anti-union animus on the part of Amerijet and/or a hostility by Amerijet towards union organizing activities by the particular group of employees with whom Mr. Casillas met (the on-airport in-warehouse cargo handling employees)."  (Mot. 23–24) (emphasis in original).  Given Amerijet's stipulation for the purposes of the Motion, the Court finds it unnecessary to address this element.

### 4.    *Whether There was a Causal Connection Between Amerijet's Animus and the Discharge Decision and Whether Amerijet Would Have Terminated Plaintiffs Anyway*

Amerijet asserts that its decision to terminate Plaintiffs and outsource cargo handling services at MIA "was motivated by Amerijet's legitimate desire to eliminate the controversy with its own employees and the County both as to whether its in-warehouse cargo handling

employees at MIA should be paid in accordance with the Wage Ordinance." (*Id.* 24).  As the NLRB explains in its lengthy discussion in *Wright Line*, cited by Amerijet for this issue, this element of the *prima facie* case is also related to the question of whether the employer can show it would have terminated its employees even in the absence of protected union conduct, once a *prima facie* case is established and the burden is shifted to the employer.  Thus, the Court addresses both issues here.

*Wright Line* draws a distinction between "pretext" and "dual motive" RLA cases, observing:

> In modern day labor relations, an employer will rarely, if ever, baldly assert that it has disciplined an employee because it detests unions or will not tolerate employees engaging in union or other protected activities.  Instead, it will generally advance what it asserts to be a legitimate business reason for its action.  Examination of the evidence may reveal, however, that the asserted justification is a sham in that the purported rule or circumstance advanced by the employer did not exist, or was not, in fact, relied upon.  When this occurs, the reason advanced by the employer may be termed pretextual.

251 N.R.B. at 1083–84.  In other cases, however, an employer may have "dual" motives — one a legitimate business reason, and the other "not a legitimate business reason but . . . instead the employer's reaction to its employees' engaging in union or other protected activities."  *Id.* at 1084.  In the case of a dual motive, the Court must further inquire into the role each motive plays.  *See id.*

After a lengthy discussion of Supreme Court and other precedent, the NLRB in *Wright Line* concluded that an employee must show protected conduct "was a motivating factor in the employer's decision" for the causation element of his *prima facie* case.  *Id.* at 1089 (internal quotation marks omitted).  Once the employee has done so and the burden is shifted to the employer, "should the employer be able to demonstrate that the discipline or other action would have occurred absent protected activities, the employee cannot justly complain if the employer's

action is upheld." *Id.*

Amerijet avers that its legitimate desire to resolve the Wage Ordinance issue at once establishes that any anti-union animus could not have caused Plaintiffs' termination, defeating Plaintiffs' *prima facie* case, as well as proves that even if a *prima facie* case were shown, Plaintiffs would have been terminated in any event for this business reason.  This argument fails to persuade.

One need only examine the timing of the events in this action to see that there is at least an issue for the fact-finder as to whether Amerijet's animus caused Plaintiffs' termination and whether Plaintiffs would have been terminated regardless.  The Wage Ordinance issue arose in June 2010, or approximately nine months before the IBEW Petition was filed.  The parties' undisputed account is that while the SBD initiated an investigation into Amerijet's compliance with the Wage Ordinance in June 2010, the SBD's role in this investigation ended the next month in July 2010, and nothing further was done by the County Attorney.  (*See* SMF ¶¶ 14–20). Amerijet took no further action to press for a resolution with the County Attorney (*see id.* ¶ 20). Then, approximately eight months later on April 8, 2011, the IBEW Petition was filed.  (*See id.* ¶ 21).  By the end of April 2011, Amerijet had responded to the Petition (*see id.* ¶ 42), hired Casillas to speak with Plaintiffs (*see id.* ¶ 53), entered into a contract with AGI to perform cargo handling services at MIA (*see id.* ¶¶ 66–67), and laid off all in-warehouse Cargo Handlers at MIA, including Plaintiffs (*see id.* ¶ 67).

It may be that Amerijet solely terminated Plaintiffs to solve the Wage Ordinance issue as raised in June 2010, and that the timing of the termination relative to Plaintiffs' organization activity was coincidence.  However, a fact-finder may also conclude that Amerijet was not nearly as concerned with the Wage Ordinance while it remained the complaint of one anonymous

employee and the subject of a slow-moving investigation.  Rather, as a fact-finder might

conclude, only when its employees began organizing did Amerijet see the need to act.

Remarkably, Amerijet itself as much as admits in its Reply that this is precisely what happened,

stating:

> [A]s to Plaintiffs' contention that the Wage Ordinance controversy arose in June
> 201 [sic] but no action was taken by Amerijet until 10 months later, after Amerijet
> became aware of union organizing activity, . . . the undisputed record evidence
> explains the timing.  Specifically, *there was no basis for any action while the
> County's investigation was on hold, until a second agency filing was made on
> behalf of these same employees in April of 2011 with the NLRB*, resulting in the
> engagement of a consultant to meet with this group of employees; *when the report
> from that consultant was that these employees believed they should be paid the
> [sic] according to the wage ordinance, it became clear to Ms. Suria that the
> controversy needed to be resolved* even though no opinion had been rendered by
> the County.

(Reply 10–11) (emphasis added).

Amerijet appears to acknowledge outright that the Wage Ordinance only became an issue

when compounded by union activity, which forced Amerijet to seriously contemplate methods of

compliance.  Amerijet's position, as construed by the Court, is that the issue of compliance with

the Wage Ordinance was fundamentally a legitimate business reason for Plaintiffs' termination,

albeit a reason clearly brought into relief by the threat of Plaintiffs' unionization.  The Court is

troubled by such a reading of the RLA, which would seem to render the statute meaningless.

The Court surmises that an employer might very often find a business reason to discourage not

only union activity, but the *object* of union activity, which cannot be presumed to occur in a

vacuum.  Union organization with the object of advocating for higher wages, as was done in this

action, hardly strikes the Court as a novel or unusual concept.  The Court cannot envisage the

RLA to permit an employer to quash unionization because the purported union's object is not in

its business interest — such a result is surely contrary to congressional intent.  It may have been

in Amerijet's business interest to discourage Plaintiffs' activities in the context of the Wage Ordinance.  What the RLA requires the Court to do, however, is to distinguish between an employer's business interest in discouraging union activity (and its object), and other, *legitimate* business interests. Congress in enacting the RLA has distinguished the former as an illegitimate motivation for discharging employees.

In light of the timing of events and Ameirjet's own statements, Amerijet has not demonstrated beyond dispute that it would have terminated Plaintiffs regardless of their organization activities.  The Court will not grant Amerijet summary judgment on this basis.

### 5.    *Whether Plaintiff Rafael Bello May Establish a Prima Facie Case*

Amerijet contends that at the very least summary judgment should be granted as to Plaintiff Bello's claim.  Amerijet asserts that Bello cannot establish a *prima facie* case under the RLA because his termination was clearly motivated by legitimate business reasons, namely that he had exhausted all of his FMLA and workers' compensation leave and could not return to work.  (*See* Mot. 29–30).  According to Amerijet, Bello has not shown Amerijet had any knowledge of putative union activity prior to his termination.  (*See id.* 30).  In particular, the timing of Bello's termination raises issues.  The letter Bello received notifying him of his termination is dated April 7, 2011 (*see* SMF ¶ 76), or one day before the IBEW Petition was filed.

Plaintiff argues, however, that the April 7, 2011 letter did not appear on Amerijet stationery and was not delivered to Bello until April 14, 2011, raising a question of when the letter was actually executed.  (*See* Resp. 12 (citing Apr. 7, 2011 Letter [ECF No. 114-29]; Certified Mail Receipt [ECF No. 114-30])).  The corresponding personnel action form indicates an effective termination date of April 8, 2011, and it was not signed by the department director

until April 11, 2011, or by human resources until May 9, 2011 (*see id.* (citing Personnel Action

Form [ECF No. 114-31])).  Plaintiffs further state that Bello's FMLA leave had actually expired

months earlier, in November 2010.  (*See id.* (citing Unemployment Benefit Determination [ECF

No. 114-33])).

The exact date that Amerijet learned of the IBEW Petition, moreover, is in dispute.

Amerijet contends it learned of it on April 11, 2011.  (*See* Mot. 30).  However, Plaintiffs note

that the letter to Amerijet containing the IBEW Petition is dated April 8, 2011 (*see* Resp. 12

(citing Apr. 8, 2011 Letter [ECF No. 114-6])), and the facsimile from the NLRB containing the

IBEW Petition is also dated April 8, 2011 (*see id.* (citing IBEW Petition [ECF No. 102-4])).

According to Plaintiffs, the only evidence that Amerijet learned of the Petition on April 11, 2011

is Richardson's declaration (*see* Decl. of Rasheme Richardson ("Richardson Decl.") ¶ 8 [ECF

No. 102-1]).  Nevertheless, Richardson could not remember this fact at his deposition.  (*See*

Deposition of Rasheme Richardson, Jan. 11, 2012 [ECF No. 114-9] ("Richardson Dep.") 13:18–

14:3 ("Q: How did you know about that petition? A: I received a document, attention to me.  Q:

And who sent that to you?  A: I don't recall.  Q: Was it from the NLRB?  A: I don't recall.  Q:

And then at that point you became aware that — do you know when you first became

knowledgeable?  Was it in March or April, 2011?  A: I don't recall.")).

Amerijet summarily states in reply that "because the undisputed evidence . . . shows that

Bello's termination paperwork was generated and executed by at least one responsible company

representative as of April 8, 2011, and reflects a termination date of April 8, 2011, but Amerijet

did not receive the NLRB petition until April 11, 2011, Amerijet could not have terminated Bello

for any putative union activity."  (Reply 12).  Amerijet dismisses the facsimile dated April 8,

2011 as a document "that was in the union's possession and not Amerijet's possession."  (*Id.* n.5).

The Court finds, in light of the evidence, a question of fact as to whether Bello was terminated after Amerijet learned of the IBEW Petition, and whether an inference may be made that Bello's termination was related to the union organization activities in question.   A reasonable fact-finder could conclude that Bello's termination was not executed until April 8, 2011, the April 7 date on the letter (received by Bello on April 14) notwithstanding.   A reasonable fact-finder moreover could conclude that Amerijet learned of the IBEW Petition as early as April 8, 2011, Richardson's declaration to the contrary notwithstanding.   A reasonable fact-finder could infer that the IBEW Petition was causally related to Bello's termination.   This is particularly true in light of Plaintiffs' argument that Bello was susceptible for termination as having depleted his FMLA leave as early as November 2010, but no termination action was taken for months, or until (approximately) the time the IBEW Petition was filed.   Amerijet disputes this fact in the context of Plaintiffs' own motion for summary judgment [ECF No. 114], but the existence of a dispute only further underscores the inappropriateness of summary judgment.

At the same time, a reasonable fact-finder might well find the opposite — that Bello was terminated days before Amerijet learned of Plaintiffs' organization attempts.   It is not for the Court to decide this disputed issue in place of the fact-finder at this stage.

6.     *Whether Plaintiffs May Proceed With a Claim for Punitive Damages*

When a right of action has been implied under a federal statute, courts must "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 66 (1992).  As the Court previously held, an

implied right of action exists under the RLA Section 2, Third and Fourth, for major disputes such as the present action.  (*See* Nov. 28, 2011 Order 7).  The question is whether punitive damages have been limited under the RLA, such that the *Franklin* presumption is overcome.

Amerijet argues that although the "weight of authority holds that an employee who is not represented by a union and is not party to a collective bargaining agreement may seek punitive damages for violations of the RLA," the Court should disregard this authority in favor of an approach espoused by the Supreme Court in *International Brotherhood of Electrical Workers v. Foust*, 442 U.S. 42 (1979).  (Mot. 31–32).  Amerijet cites several other cases taking a similar approach, generally with little discussion, to find the RLA does not permit punitive damages. (*See id.* 32 (citing *Tipton v. Aspen Airways, Inc.*, 741 F. Supp. 1469 (D. Colo. 1990); *Maas v. Frontier Airlines, Inc.*, 676 F. Supp. 224, 226 (D. Colo. 1987); *Grosschmidt v. Chautauqua Airlines, Inc.*, No. C85-1432-A, 1986 WL 10077 (N.D. Ohio Apr. 11, 1986); *Bhd. Ry. Carmen of the United States and Canada v. Delpro Co.*, 579 F. Supp. 1332 (D. Del. 1984); *Brady v. Trans World Airlines, Inc.*, 196 F. Supp. 504, 506–07 (D. Del. 1961))).

The Supreme Court's decision in *Foust*, however, does not compel the holding that Amerijet urges.  That claim involved a case by an employee against a union for breach of its duty of fair representation.  *See* 442 U.S. at 43.  There was a collective-bargaining agreement already in place between the union and the employer, *see id.*, unlike the instant case.  Moreover, prominent in the opinion is the Supreme Court's concern for limitations on union liability and allowing remedies for union misconduct "without compromising the collective interests of union members in protecting limited funds."  *Id.* at 50.  The Court emphasized that punitive damage awards "could deplete union treasuries."  *Id.*  The Court further expressed concern about the disruption of "responsible decisionmaking essential to peaceful labor relations."  *Id.* at 51–52.

Needless to say, the concern with protecting the union's collective interests and finances is not at issue here.  In that sense, *Foust* is of little value in assisting the Court to resolve this dispute.  In fact, the court in *Delpro*, a case Amerijet cites, recognized as much, observing:

> The *Foust* court directed its analysis to suits against unions.  That analysis is not immediately transferable to actions against employers.  Two of *Foust*'s policy arguments in particular have less import in suits against management.  One is *Foust*'s concern with the economic hardship wrought by punitive awards.  The other is the *Foust* Court's fear that collective interests would be sacrificed for those of the individual.

*Delpro*, 579 F. Supp. at 1335.  The *Delpro* court ultimately declined to allow punitive damages in that suit by employees against an employer for failing to bargain in good faith with their union and unilaterally changing working conditions and terms.  *See id.* at 1333.  Nonetheless, the Court finds the reasons the court employed in *Delpro* are less compelling here.  That court found that "[t]o allow a threat of unpredictable punitive awards against employers, where unions sitting opposite them at the bargaining table are immune from such threats, would unfairly multiply the unions' arsenal of negotiating weapons," creating an "imbalance" in labor negotiations and threatening "congenial labor relations between union and management."  *Id.* at 1336.  The court in *Delpro* further found that punitive damages "would conflict with the general goals of national labor legislation," which has broad remedial goals.  *Id.*

In decisions such as *Foust* and *Delpro*, the Court perceives the issue of punitive damages under the RLA to raise concerns about the integrity and balance of the collective bargaining system as a whole.  Insofar as this is the object, the Court is persuaded by what all parties recognize as the "weight of authority," or cases that find the integrity of the system to raise different considerations when the plaintiff-employee is as yet *un*-represented by a union.  The threat of punitive damages may be a necessary protection to enable him to take his place in the system to begin with.  All parties acknowledge *Lebow v. American Trans Air, Inc.*, 86 F.3d 661

(7th Cir. 1996), to represent prevailing authority along this line.  The Seventh Circuit in *Lebow* addressed, as an issue of first impression before any federal court of appeals, "whether an employee suing an employer under the Railway Labor Act for discharging him because of his union-organizing activities is entitled (1) to a jury trial and (2) to seek punitive damages."  *Id.* at 663.  The plaintiff in *Lebow* had been working on a secretive campaign, which ultimately failed, to have his fellow pilots represented by a union.  *See id.* at 664.  The plaintiff passed out authorization cards and spoke to many people, among other activities.  *See id.*

The court in *Lebow* considered the same arguments as those made here by Amerijet and found *Foust* to be inapposite, since "[a]n unlawful discharge suit by an unrepresented employee against his employer . . . is quite different from a fair representation suit by a union employee against his union.  Awarding punitive damages to non-union employees would not interfere with the collective bargaining process because there is no collective bargaining process with which to interfere."  *Id.* at 672.  The court noted that without such punitive damages, "employers may not be sufficiently deterred from inappropriately discharging union organizers."  *Id.*  The Seventh Circuit moreover stated that punitive damages could be awarded for "intentional misconduct (firing him because he engaged in protected activity)."  *Id.* at 670.

The Court finds the holding in *Lebow* well-suited to the case at hand.  Plaintiffs have sufficiently established at least an issue of fact as to whether they were intentionally terminated as a result of protected activities.  Thus, the Court also rejects Amerijet's argument that even if punitive damages are permissible, they are not appropriate on the facts of this case.  (*See* Mot. 33).  Amerijet asserts this is so because it had no knowledge of any union organizing activities, and the IBEW Petition was irrelevant because the NLRB lacked jurisdiction over Amerijet.  (*See id.* 34).  The Court has already dismissed these arguments and does not find them to be a

convincing basis for the exclusion of any possible punitive damages here.

       7.     *Whether Plaintiffs May Seek Non-Pecuniary Damages for Emotional Distress, Pain, and Suffering*

Plaintiffs state in the Complaint that they seek damages for "emotional distress and humiliation and pain and suffering." (Compl. 3–4). Amerijet notes that, as for punitive damages, the RLA does not specify whether Plaintiffs may seek such non-pecuniary damages, but other statutes have been interpreted by some courts not to include such damages. (*See* Mot. 35). Amerijet again invokes the broad "remedial" nature of the RLA (Reply 14), and cites a case that the Court finds inapplicable.[2]

Plaintiffs point to cases in which compensatory damages were found to be permissible under the RLA. (*See* Resp. 16 (citing *Riley v. Empire Airlines, Inc.*, 823 F. Supp. 1016 (N.D.N.Y. 1993); *Schlang v. Key Airlines, Inc.*, 794 F. Supp. 1493 (D. Nev. 1992))). In *Riley*, the court found compensatory damages for emotional distress to be available in certain cases for RLA violations, and "[i]ndeed, the rationale is stronger on the issue than on the issue of punitive damages. Because compensatory damages are designed to compensate the employee for real losses incurred as a result of the employer's unlawful conduct, such damages are fully consistent with the remedial objectives of national labor policy." 823 F. Supp. at 1025. The court noted that unlike punitive damages, such compensatory damages could not be construed as "private fines." *Id.* at 1025–26. The court found compensatory damages would serve the overarching goals of collective bargaining by further protecting unrepresented employees from their

---

[2]  Amerijet cites *Lewy v. Southern Pacific Transportation Co.*, 799 F.2d 1281 (9th Cir. 1986), for the contention that the RLA was intended "to limit wrongfully discharged employees to the remedies of reinstatement and back pay." *Id.* at 1295. Nevertheless, the decision in *Lewy* addressed "minor" disputes, which the Court has already explained would be governed by the RLA's grievance and arbitration procedures. (*See* Nov. 28, 2011 Order 5). Thus, the *Lewy* court stated that the RLA preempts state tort claims for intentional infliction of emotional distress where the tort is governed by a collective bargaining agreement. *See* 799 F.2d at 1290. The *Lewy* decision does not apply to this "major" dispute. (Nov. 28, 2011 Order 8).

employers' potential abuses.  *See id.* at 1026.  The reasoning in *Riley* is persuasive here. Amerijet has not convincingly shown why the RLA precludes compensatory damages.  *See Franklin*, 503 U.S. at 66.

Amerijet asks in the alternative that each Plaintiff's action be severed at trial, an argument more fully developed in Amerijet's motion to bifurcate [ECF No. 100], which the Court will address in a separate order.

### 8.     *Whether Plaintiffs May Proceed With a Request for Attorney's Fees*

Amerijet asserts that to the extent Plaintiffs seek attorney's fees (*see* Compl. 3), Plaintiffs should not be permitted to contravene the American Rule providing that prevailing litigants ordinarily do not collect attorney's fees from the loser.  (*See* Mot. 36 (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975))).  Amerijet further points to a provision of the RLA that specifically provides for attorney's fees, where a carrier fails to comply with an order of the National Railroad Adjustment Board, as evidence that had Congress wished to permit attorney's fee awards for violations of RLA Sections 2, Third and Fourth, it would have done so explicitly.  (*See id.*).

Plaintiffs acknowledge in response that the Eleventh Circuit is silent on the issue, but point to *Williams v. ABX, Inc.*, No. 1:06cv833, 2007 WL 2886283 (S.D. Ohio Sept. 27, 2007), as persuasive authority.  The defendant in *Williams* argued that the remedy of attorney's fees was not provided for under Section 2, Third or Fourth of the RLA, and the plaintiffs "acknowledge[d] that it is not clear whether attorney fees are available for RLA claims."  2007 WL 2886283, at *7.  The court noted the governing American Rule, stating that there is a "bad faith" exception allowing attorney's fees "in certain exceptional cases where the opposing party has acted in bad faith."  *Id.* (citing *Shimman v. Int'l Union of Operating Eng'rs*, 744 F.2d 1226, 1229 (6th Cir.

1984)).  The court in *Williams* held, "[b]ecause such an award could be available to Plaintiffs, the Court finds that dismissing Plaintiffs' claim for attorney's fees would be premature at this juncture," on a motion to dismiss.  *Id.* (citing *Pinnacle Airlines, Inc. v. Nat'l Mediation Bd.*, No. Civ. 03-1642 ESH, 2003 WL 23281960 (D.D.C. Nov. 5, 2003) (denying, at early stage of litigation, motion to strike claim for attorney's fees in suit against union under RLA "as later developments may provide a legitimate basis for an attorneys' fees award")).

The Court notes, however, that the decision in *Williams* turned at least in part on the stage of the litigation — the court found it premature to grant defendant's request on a motion to dismiss.  Similarly, in *Pinnacle*, the court found the early motion to strike premature.  The Court has not found any reason, including in the single case cited by Plaintiffs, to depart from the American Rule here.  Plaintiffs appeal to the "discretion" of the Court to determine remedies as a reason not to grant summary judgment.  (Resp. 16).  In *Alyeska*, the Supreme Court enumerated exceptions to the American Rule arising out of the "inherent power in the courts to allow attorneys' fees in particular situations, unless forbidden by Congress," including a party's willful disobedience of court orders and acting in "bad faith, vexatiously, wantonly, or for oppressive reasons."  *Alyeska*, 421 U.S. at 258–59 (internal quotation marks and citations omitted). Plaintiffs have pointed to nothing in the record creating an issue of fact relevant to any of these exceptions.  Accordingly, the Court grants summary judgment as to this claim.

9.      *Whether Plaintiffs May Proceed With a Jury Trial Demand*

Amerijet asserts that because Plaintiffs' claims for punitive and non-pecuniary emotional distress damages fail as a matter of law, Plaintiffs seek only equitable relief in the form of back pay, reinstatement, front pay, and injunctive relief.  (*See* Mot. 36–38).  As a result, Amerijet contends Plaintiffs have no right to a jury trial.  (*See id.* 38).  Amerijet further cites *Lynch v. Pan*

*American World Airways, Inc.*, 475 F.2d 764, 765 (5th Cir. 1973), for the proposition that where claims for punitive damages and non-pecuniary emotional damages are not well-founded, no right to a jury exists in suits seeking back pay and other equitable relief.  (*See id.*).

Because the Court declines to find that Plaintiffs' claims for punitive and non-pecuniary emotional damages fail as a matter of law or are ill-founded, the Court accordingly declines to grant Amerijet summary judgment as to Plaintiffs' request for trial by jury.  *See Lebow*, 86 F.3d at 672 (holding that since the plaintiff's claims under RLA were analogous to common-law causes of action, and the plaintiff had sufficiently alleged right to seek punitive damages, Seventh Amendment guaranteed the plaintiff right to trial by jury).

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED AND ADJUDGED** that Defendant, Amerijet International, Inc.'s Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(h), Or, In the Alternative, Fully-Dispositive Motion for Summary Judgment **[ECF No. 101]** is **GRANTED in part** and **DENIED in part**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 24th day of May, 2012.

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record